Neaderhouser v. The State.

*F. T. Brown*, for appellant.

———————◆———————

NEADERHOUSER v. THE STATE.

<table>
<tr><td>28</td><td>257</td></tr>
<tr><td>152</td><td>148</td></tr>
<tr><td>28</td><td>257</td></tr>
<tr><td>169</td><td>183</td></tr>
</table>

CRIMINAL LAW.—PLEADING.—In a criminal prosecution the defendant may plead specially any matter in confession and avoidance constituting a defense, and the proper method to test the sufficiency of such plea is by demurrer.

SAME.—As in criminal cases all matters of defense are admissible under the general plea of not guilty, the Supreme Court will not reverse a judgment for an error of the court below in rejecting a special plea.

MILL-DAM.—APPURTENANT TO MILL SEAT.—Where a mill and mill seat are conveyed by deed, as such, by metes and bounds, the dam will pass as appurtenant to the mill seat, though it is not included within the metes and bounds given, and does not abut on the land described.

SAME.—EVIDENCE.—In a prosecution for a nuisance, in the erection and

continuance of a mill-dam, the defendant justified under an act of the legislature authorizing his grantor to construct the dam. The deeds given in evidence to show the defendant's title described only the mill seat by metes and bounds, and to show his title to the dam, the defendant offered to prove that the dam was built by the person to whom the legislative grant was given, and that he and his grantees had ever since been in possession under a claim of right from him.

*Held*, that the evidence offered was competent, and was sufficient evidence of title against all other persons except the owners of the banks.

NAVIGABLE STREAMS.—ORDINANCE OF 1787.—Under article 4 of the ordinance of 1787, the navigable waters leading into the *Mississippi* and *St. Lawrence* rivers, &c., cannot be obstructed by State authority, but the operation of the act and the power of Congress over this subject is limited to those streams which are channels of commerce between the States—such as are navigable in fact for vessels of commerce coming out of and returning into the navigable waters of other States, by continuous voyages.

SAME.—JUDICIAL NOTICE.—The courts will take judicial notice of the navigability of streams, as a part of the common public history of the country.

SAME.—WABASH RIVER.—The *Wabash* river, where it passes through *Adams* county, in this State, is not a navigable stream.

SAME.—NUISANCE.—MILL-DAM.—Wherever, in the course of a stream, it ceases to be a public highway for commerce between this and other States, at that point its national character terminates, and above that it is within the exclusive jurisdiction of the State, and a legislative act authorizing its obstruction by a mill-dam is a good defense to a prosecution for a nuisance.

NAVIGABLE STREAM.—A stream cannot be said to be navigable in the legal sense of the term, unless it be of such a character as to be useful to the public as a channel of travel or commerce.

SAME. — MILL-DAM. — When an act provides that a dam shall be built with a suitable slope or lock, so as not to interrupt navigation, the omission to provide such slope or lock will not deprive the party of the benefit of the law, when it does not appear that any person since the erection of the dam has either attempted or desired to navigate the river at that point, and especially when it is clear that it never was used, or was capable of being used, as a navigable highway, in the proper sense of the term.

APPEAL from the *Huntington* Common Pleas.

ELLIOTT, J.—In *September*, 1864, an affidavit and information were filed against *Neaderhouser*, the appellant, charging him with keeping and maintaining a public nuisance; at said county, by keeping and maintaining a mill-dam across the *Wabash* river therein.

The complaint alleges that the *Wabash* river, which passes through the county of *Adams*, has always been a navigable stream in and through said county, for canoes, pirogues, rafts and small water-craft, and that prior to the keeping and maintaining a mill-dam across said stream, by the defendant, *Neaderhouser*, the citizens of said county and the public generally, "rowed, steered and propelled their canoes, pirogues, rafts and other water-craft, up and down said river, in said county, without let or hindrance;" that said *Neaderhouser*, on the 1st day of *January*, 1863, and continually thereafter, until the filing of said information, unlawfully and without authority, continued and maintained a mill-dam in and across said river, of the hight of six and a half feet, at the town of *Buena Vista*, in said county.

It is claimed in the information that maintaining said dam is a public nuisance, for the following reasons:

1. That the navigation of the river is thereby obstructed, and the citizens of said county and the public generally are prevented from navigating the same with their canoes, pirogues, &c.

2. That the water in said river is thereby turned back and flowed upon the bottom lands lying along said stream, belonging to various persons, who are named, whereby said lands are rendered damp, wet, and unfit for cultivation.

3. That the water of said stream is thereby flowed upon and over certain stone quarries, situate in the bed and banks of said river, above the dam, belonging to *Martin, Peter* and *Silas Kizer*, thereby rendering said quarries inaccessible, to the great damage of the owners thereof.

4. That the water of the river is thereby flowed back upon and over a public highway, known as the *Fort Recovery* and *Huntington* State Road, rendering the same impassable.

5. That said dam causes the water to flow back and up said stream for a distance of ten miles, and creates a great pool of stagnant water, thereby causing unwholesome smells and miasma, which renders the atmosphere in the

vicinity of said stream unwholesome and noxious, whereby the citizens of said county, living along said stream and in the vicinity of said stagnant water, are made sick and rendered unhealthy.

6. That by reason of the water being so dammed up, the channel of the stream above the dam is filling up with logs, timber, leaves, &c., thereby lessening the hight of the banks, and rendering the bottom lands, along said stream, more liable to overflow, and less fit for cultivation, to the great damage of the owners of said lands and the citizens of said county.

A change of venue was granted, and the cause transferred to the Court of Common Pleas of *Huntington* county.

The defendant moved the court to strike out of the information all that part thereof relating to the matters referred to above in the 2d, 3d and 6th specifications, on the ground that said matters were irrelevant and immaterial; which motion was overruled, and the defendant excepted.

The defendant then pleaded not guilty, and also a special plea, which was as follows: "The defendant, for further and special plea to said information, says, that by an act of the General Assembly of the State of *Indiana*, entitled an act to authorize *William McDowell*, of the county of *Adams*, to erect a mill-dam across the *Wabash* river, in said county of *Adams*, which act was approved *January* 2, 1850, and was in these words, to-wit:

'Section 1. *Be it enacted by the General Assembly of the State of Indiana*, That *William McDowell*, of the county of *Adams*, be, and he is hereby, authorized to erect and keep up a mill-dam across the *Wabash* river, in *Hartford* township, in said county of *Adams*, not to exceed six feet in hight, with suitable slope or lock, so as not to interrupt the navigation of said river, when the river is in a proper stage for the same.

'Section 2. This act to be in force from and after its publication.'

"The said *William McDowell* was authorized to erect and

keep up a mill-dam across said *Wabash* river, in said county of *Adams*. And defendant avers that said *William Mc-Dowell*, under and by authority of said act, and in conformity therewith, built a mill-dam across said *Wabash* river, in the year 1850, not exceeding six feet in hight, with a suitable slope or lock, so as not to interrupt the navigation of said river, when the river was in a proper stage for the same; which mill-dam still exists, and is the identical mill-dam mentioned in the information. And defendant avers that that part of the said *Wabash* river lying within the said county of *Adams*, and above the said mill-dam, is not and never has been navigable for vessels coming from and going to, by continuous voyages, the navigable waters of other States of the *United States* than the State of *Indiana*. And the defendant further says, that on said 1st day of *January*, 1863, and from thence hitherto, he has been in possession of said mill-dam and the mill to which it is subservient, as the legal owner of the same, under title by valid conveyance from said *William McDowell*, and that he has since the 1st day of *January*, 1863, kept and maintained said mill-dam in strict conformity with said act, in the same place where, and exactly as, it was originally built, not exceeding six feet in hight, and provided with a suitable slope or lock, so as not to interrupt the navigation of said river, when the said river is in a proper stage for the same."

On motion of the attorney for the State, the court struck out the second plea, to which the defendant excepted.

There was a trial by jury, and verdict as follows: "We, the jury, find the defendant guilty, and assess his damages at the sum of one dollar."

A motion for a new trial was overruled, and judgment was rendered on the verdict, and also that the mill-dam "be removed and abated."

Errors are assigned on the action of the court in refusing to strike out parts of the information as irrelevant, and in striking out the defendant's second plea; and also in refusing to grant a new trial, because the finding of the jury

was contrary to law, and to the evidence in the case; and for various alleged errors of law occurring at the trial, and excepted to at the time, in the admission of improper evidence on the part of the State, and in refusing to admit proper and material evidence offered by the defendant; giving improper instructions to the jury, and refusing proper ones asked by the defendant.

In the view we take of the case, it will not be necessary to examine all the questions discussed by counsel. It may be remarked, in reference to the action of the court in striking out the defendant's second plea, that we are not aware of any statute, or rule of law, prohibiting the defendant, in a criminal prosecution, from pleading specially any matter in confession and avoidance constituting a defense. The statute provides, in such cases, that the defendant may plead the general issue orally, which shall be entered on the minutes of the court, and under it every matter of defense may be proved. 2 G. & H., § 97, p. 413. But this does not prohibit the defendant from setting up any matter in confession and avoidance, constituting a valid defense, by special plea. Here the plea confesses the matters charged, and attempts to justify them under an act of the legislature, and it was error to reject it on motion. It was not a mere argumentative denial of the matters charged in the information, but a confession of them, and if the facts set up in justification were not sufficient, the objection should have been taken by demurrer. The act of the legislature, set out in the plea, authorized *William McDowell* to erect and maintain a mill-dam across the *Wabash* river, in *Hartford* township in *Adams* county, and an objection is taken to the plea, because it does not allege that the dam in controversy was built in *Hartford* township. It is, however, averred that *McDowell* built the dam under said act, " and in conformity therewith," which makes it, in that respect, sufficiently certain. The sufficiency of the plea, as a defense to the prosecution, is not properly raised by the motion to reject it. And, though we are of opinion that the facts al-

leged are sufficient to bar the prosecution (the reasons for which will presently appear in the discussion of the question in another form), we would not reverse the judgment for the error of the court in striking it out, because, as the defendant could properly give the same matters in evidence under the plea of not guilty, he was not injured or prejudiced in his defense by the error.

. It was proved on the part of the State, that the defendant had maintained the mill-dam for the period charged in the information, and that the dam caused the water to flow back in the stream, in an ordinary stage, for a distance of from seven to ten miles, whereby it became comparatively a stagnant pool. There was also evidence tending to prove that it was injurious to the health of those living in the vicinity of the river above the dam; that in times of heavy rains it caused the river to overflow its banks sooner, and the overflow continued longer, than before the erection of the dam, and that it rendered the bottom lands along the river, above the dam, more wet and unfit for cultivation, and that at times it caused a public road running near the river to become flooded with water, and thereby rendered impassable; but, in reference to all these latter matters, the evidence was very conflicting.

The defendant gave in evidence:

1. The act of the legislature authorizing *William Mc-Dowell* to erect and maintain a mill-dam across the *Wabash* river, being the same act set out in his second plea.

2. A deed from *Robert Simerson* to *William McDowell* for the mill seat, containing about one acre, dated *April* 6th, 1853.

3. A deed from *McDowell* to *Ephraim Parker*, dated *April* 6th, 1853, for the same property; and,

4. A deed from *Parker* to the defendant, for the same property, dated *January* 10th, 1856.

The description of the property conveyed is the same in all the deeds. It is a description of a tract of land by metes and bounds, containing about an acre. The tract is described

by commencing at the northwest corner, which is called the "northwest corner of the mill seat." The evidence shows that *McDowell* built a mill on the tract of land described in those deeds, and, also, in 1850 built the mill-dam described in the information, across the *Wabash* river. The dam and mill are very close together, but it appears that the dam is not on the land described in the deeds.

At a proper time in the progress of the trial, the defendant offered to prove by a witness, then on the stand, "that *McDowell* held possession of the mill and dam, at the time he built the same and afterwards, under a claim of title in fee simple in himself, and that *Ephraim Parker* and the defendant have held possession successively of the said dam and mill ever since said *McDowell* went out of possession, under a claim of title in themselves from said *McDowell*; but the court refused to permit said evidence to be given to the jury. And, in this connection, the court subsequently instructed the jury, "that the right that *McDowell* had to maintain said dam, if any, could only be conveyed by deed in writing."

We think the court erred in excluding the evidence offered, and also in giving to the jury the foregoing instructions. It is not controverted that *McDowell* built the dam under the authority conferred on him by the act of the Legislature, that he also built the mill on the land described in the deeds given in evidence, and that he subsequently sold and conveyed the land with the mill upon it. He bought and sold the land as a mill seat, and the dam, or at least all the right *McDowell* had in it, passed to *Parker* under the deed to him, and from *Parker* to the defendant, as appurtenant to the mill. But, in any event, the defendant should have been permitted to prove that *McDowell* was in possession of the dam under a claim of title in fee, at the time of the sale and conveyance to *Parker*, and that *Parker* and the defendant had, since that time, been in possession successively under a claim of title in themselves, under *McDowell*. Nor was it necessary to the defendant's defense

that he should hold a title to the dam by deed through *Mc-Dowell.* It must be recollected that this is not a controversy between the defendant and a party claiming to be the owner of the land on which the dam is built, but a criminal prosecution against the defendant for a nuisance in maintaining the dam. The dam was built by *McDowell,* claiming the right to build and maintain it under a special act of the legislature. The State proved that the defendant was in possession of the dam, and had continued and maintained it for more than a year prior to the commencement of the prosecution. The defendant proved that he had been in possession of it ever since 1856, and proposed to go farther, and prove that he and *Parker,* under whom the defendant immediately claims, had so been in possession since *April,* 1853, under a claim of right in themselves under *McDowell,* and we think it was competent evidence, and should have gone to the jury. The possession of the defendant, under a claim of right from *McDowell,* was a sufficient title against all other persons except the owner of the banks of the river against which the dam was abutted; and if they belonged to *McDowell* at the date of the deed from him to *Parker,* then the dam passed by that deed as appurtenant to the mill.

This brings us to the consideration of the principal question involved in the case, namely: Was the dam built in compliance with the act of the legislature, and, if so, does it constitute a defense to this prosecution?

The court charged the jury, if they found from the evidence that the *Wabash* is of that class of streams which are navigable in fact for vessels coming out of and returning to the navigable waters of other States, by continuous voyages, that they need proceed no further in their investigations, for the legislature had no right to authorize its obstruction, and it would be their duty to find the defendant guilty.

The fourth article of the ordinance of Congress of *July* 13th, 1787, "for the government of the territory of the *United States* northwest of the river *Ohio,*" declares that

"the navigable waters leading into the *Mississippi* and *St. Lawrence*, and the carrying places between the same, shall be common highways, and forever free, as well to the inhabitants of said territory as to the citizens of the *United States*, and those of any other State that may be admitted into the confederacy, without tax, impost, or duty therefor."

This ordinance, though passed prior to the constitution of the *United States*, has been recognized and adopted by subsequent acts of Congress, so far as it relates to navigable streams, so as to give it the force of a subsisting law of the *United States*. *Depew* v. *The Board of Trustees of the Wabash and Erie Canal*, 5 Ind. 8, and cases there cited.

The power conferred on Congress by the constitution of the *United States*, sec. 8, art. 1, "to regulate commerce with foreign nations, and among the several States, and with the *Indian* tribes," includes, as a necessary incident, the power to keep open and free the national channels of that commerce. *Gibbons* v. *Ogden*, 9 Wheat. 1; *The State of Pennsylvania* v. *The Wheeling, &c., Bridge Co.*, 13 Howard 518; *Depew* v. *The Board of Trustees of the Wabash and Erie Canal, supra.*

Congress having exercised this power by declaring that the navigable waters leading into the *Mississippi, &c.*, shall be common highways, and forever free to the citizens of all the States, the navigation of such streams cannot be materially obstructed by state authority. But this power of Congress is confined to those streams which are channels of commerce between the States; such as are navigable, in fact, for vessels of commerce coming out of, and returning into, by continuous voyages, the navigable waters of other States.

The *Mississippi*, and its navigable tributaries, extending from the *Gulf of Mexico*, in almost every direction, for thousands of miles into the interior of a most fertile and productive country, are great public thoroughfares, or channels of commerce, which, for the purposes of navigation, are the common property of all the States, a large number

of which are immediately interested in their free navigation. Such streams are national in their character, and should not be so subject to State authority as to render their free navigation liable to obstruction, or their value as great commercial highways to be lessened.

The courts take judicial notice of such streams, as they form a part of the geography of the country, and their navigability is known, as forming a part of the common public history. For instance, we take judicial notice that the *Ohio* river, forming the southern boundary of the State, and the *Wabash*, for some distance above its confluence with the *Ohio*, are navigable for vessels freighted with commerce, and that they are used as commercial highways in the trade and commerce between different States. But, as to the *Wabash*, this historic character ceases far below the county of *Adams*, and the evidence in the case leaves no pretext for claiming for its navigation in that county a national character. Nor is such a character claimed for it in the information, which only alleges that it is navigable in and through *Adams* county, "for canoes, pirogues, rafts and small watercraft." The instruction copied above was not, therefore, applicable to either the issue or the evidence in the case, and should not have been given. Its form, too, was well calculated to deceive and mislead the jury. It seems to ignore entirely the question of the navigable character of the river in *Adams* county, and informs the jury that if the *Wabash* is of that class of streams navigable in fact for vessels coming out of and returning to the navigable waters of other States by continuous voyages, they need proceed no further, but should find the defendant guilty.

That the lower *Wabash*, for a considerable distance, is a navigable stream of the character described, could not be controverted, and the jury might readily infer from the instruction, that if such national character once attached to the stream, it would necessarily continue to its source; but such is not the law. Wherever, in the course of the stream, it ceases to be a public highway for the commerce between

this and other States, at that point its national character terminates, and above that it is within the exclusive jurisdiction of the State.

Streams, where they are only navigable for certain kinds of inferior craft, or for certain distances within the State, and where they are not visited by vessels of commerce coming from and going to the navigable waters of other States, by continuous voyages, are subject only to the jurisdiction of the State, and the legislature, in its own discretion, may authorize their obstruction, at pleasure, when deemed proper for the public good. *Depew* v. *The Board of Trustees, &c.*, *supra*; *Butler et al.* v. *The State*, 6 Ind. 165. Such, at most, is the character of the *Wabash* in *Adams* county, if, indeed, it can be called a navigable stream at that point, in any sense of the term.

Whether a prosecution for a nuisance, under the laws of the State, can be maintained against a person for obstructing the navigation of a river of a national character, within the State, but over which the State has no jurisdiction, when such obstruction is expressly authorized by an act of the legislature, we need not here decide, as we do not think the question is presented under the facts of the case. It was held in *Cox* v. *The State*, 3 Blackf. 193, that such an act of the legislature was no defense to such a prosecution. That such an enactment would be no defense to a suit for a private injury caused by the obstruction, or to a civil suit to abate it as a nuisance, there can be no doubt. But for the State to punish a party criminally for an act which the legislature had expressly authorized, is a very different question.

It is, however, well settled that where a navigable stream within the State, and subject to its exclusive jurisdiction, is obstructed by a dam, or otherwise, in pursuance of legislative authority, though the health of the neighborhood may be thereby impaired, or other injuries result to persons residing in the vicinity, the party making the obstruction is not thereby subject to a prosecution for erecting or main-

taining a public nuisance, nor can the dam, or other obstruction, be abated as such.  *Depew* v. *The Board of Trustees, &c.*, and *Butler* v. *The State, supra*; *Stoughton* v. *The State*, 5 Wis. 291.  See, also, *Harris* v. *Thompson*, 9 Barb. 350; *The People* v. *Law*, 34 Barb. 514; *Barnes* v. *The City of Racine*, 4 Wis, 494; *Williams* v. *The New York Central Railroad Co.*, 18 Barb. 222.

The act of the legislature authorizing *McDowell* to erect and maintain the dam, provided that it should not exceed six feet in hight, "with suitable slope or lock, so as not to interrupt the navigation of said river, when the river is in a proper stage for the same."  The evidence shows very clearly that the dam is not to exceed six feet in hight, but it is insisted by the counsel representing the State, that the dam does not contain such a slope or lock as to admit of the passage of boats, and that the act, therefore, affords no protection.  The witnesses who testify in reference to this point, all admit that in the construction of the dam, a space was left at one end, between the end of the dam proper and the fore-bay, of sufficient width to pass any craft that could navigate the stream at that point.  This space is filled by means of thick plank, the ends of which pass down in grooves, and can be drawn out.  Some of the witnesses, however, seemed to think that the pressure of the water against the lower planks would prevent them from being drawn by any reasonable force.

We place very little stress, however, upon this provision of the act.  The object of it was to protect the navigation of the stream, to such as might desire to use it for that purpose; but it does not appear by the evidence that any person, since the erection of the dam, has either attempted or desired to navigate the river at that point.  Indeed, it seems clear from the evidence, that it never was used, or was capable of being used, as a navigable highway, in fact, in that county, in the proper sense of the term.  True, it is shown that in the early settlement of the county, when it was a dense and almost unbroken forest, without roads or public

highways of any kind, with a population consisting of a few pioneers sparsely scattered over its territory, persons did occasionally pass up and down the stream in canoes and pirogues. A few extracts from the evidence will suffice to present the facts on this point in a proper light.

*Abram Studabaker*, a witness for the State, testifies that "the river was used some by canoes and rafts before the dam was built. It cannot now be used because of the dam."

*Robert Simison,* another one of the State's witnesses, testifies that "before the dam was built, people used to travel up and down the river some in canoes. I suppose that the disuse of the river for navigation is mainly owing to the improvement of the roads, so that persons can go about in wagons."

*James Clendening* testifies that "the river never was used much for navigation. Persons used to pass up and down occasionally in canoes. There has been no attempt to navigate it of late years."

*Josephus Martin* says: "The river has never been much used for navigation. People would occasionally pass along in a canoe. I have rafted timber down it since the dam was built. There were natural obstructions that were harder to pass than the dam."

*Benjamin Brown* says: "I have lived near the dam for twenty-seven years. The river has never been used as a highway to speak of. Persons have occasionally passed in skiffs and canoes. When the water is high enough for rafting, a raft could pass over the dam without difficulty. All the travel has of late years been by the roads, and always was with rare exceptions. The river has never been used by anything but canoes and such like craft, and only for short distances inside the State."

A stream cannot be said to be navigable, in the legal sense of that term, unless it be of such a character as to be useful to the public as a channel of trade or commerce. In *Ledyard* v. *Ten Eyck*, 36 Barb. 102, it was held that *Cazenovia Lake*, which is five miles in length and three-fourths of

a mile wide, was not a navigable water. CAMPBELL, J., said : "It is not, in the language of Lord HALE, a highway for man or goods, or both, from one inland town to another. It is too small to be of any practical use in navigation." See, also, *Morgan* v. *King*, 30 Barb. 1; *Shaw* v. *Crawford*, 10 John. 236.

In the case at bar, the court instructed the jury that no right to maintain the dam could be claimed under the act, unless the condition as to the slope or lock was fully complied with, and that it would make no difference whether, as a matter of fact, any person was prevented, in the navigation of said river, from passing said dam, but on that point the inquiry should be, could a person have conveniently passed up and down said river at suitable stages of the water for navigation, with such craft as were usual to the river, without interruption, if they had so desired? And, at the same time, refused to instruct the jury, at the request of the defendant, as follows :

"If the *Wabash* river was not, at the time laid in the information, which is the 1st of *January*, 1863, and has not been since, of any actual or practical public utility whatever, as a highway for navigation, the defendant will not be liable to punishment for obstructing its navigation merely."

By the instruction thus given to the jury, and the refusal to give that asked by the defendant, the court virtually directed the jury that they must convict the defendant for maintaining the dam as an obstruction to the navigation of the river, unless the dam contained a lock or slope as required by the act, although they might find, from the evidence, that the river was not of any practical public utility whatever, as a highway for navigation, and notwithstanding it should further appear that, in fact, no person had been prevented from or obstructed in the navigation of said stream. This was clearly erroneous. If no one was prevented or interrupted in the navigation of the river, then there was, in that respect, "no obstruction to the free use of prop-

erty," no injury done, and consequently there was no nuisance, by obstructing the navigation.

The judgment is reversed, with costs, and the cause remanded for a new trial in accordance with this opinion.

*A. G. Porter*, *B. Harrison* and *W. P. Fishback*, for appellant.

*D. Studabaker*, for appellee.