NORTH AMERICAN DREDGING CO. OF NEVADA et al. v. MINTZER et al.

(Circuit Court of Appeals, Ninth Circuit. October 1, 1917.)

No. 2913.

1. NAVIGABLE WATERS ⬤⫸1(1)—WHAT CONSTITUTES "NAVIGABLE" STREAM.

A tract of marsh or tide lands largely submerged at flood tide was intersected by tidal sloughs, one of which was a mile, more or less, in length, and in its lower reaches as wide as 100 feet or more, with a depth of from 2 feet or less at low tide in its shallowest parts to approximately 7 or 8 feet at its flood, and deepening somewhat towards its mouth. It had never been used or regarded as navigable, other than for duck boats or punts for hunting or fishing, until within a few years, when an oil company established a plant on adjoining land, and on a few occasions took power boats and scows of light draft up the channel on the flood tide, and it was impracticable to put the channel to such use without deepening it for the purpose. *Held*, that the stream was not a "navigable" stream.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Navigable.]

2. NAVIGABLE WATERS ⬤⫸37(7)—LANDS UNDER WATER—CONSTRUCTION OF GRANT.

Title to the soil underlying such channel was in those claiming under a grant from the state, whether or not the channel was navigable.

Appeal from the District Court of the United States for the Second Division of the Northern District of California; Wm. C. Van Fleet, Judge.

---

Suit by Lucio M. Mintzer and another, as executors of William Mintzer, deceased, against the North American Dredging Company of Nevada and another. From an order 242 Fed. 553, —— C. C. A. ——, granting an injunction, defendants appeal. Affirmed.

Earl D. White, of Oakland, Cal., and D. J. Hall, of Richmond, Cal., for appellants.

Edward J. McCutchen and John F. Cassell, both of San Francisco, Cal., for appellees.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge. This is an appeal from an order in favor of plaintiffs below, appellees, Lucio M. Mintzer and Mauricia T. Mintzer, as executor and executrix of the estate of William Mintzer, deceased, granting injunction restraining defendant, appellant, North American Dredging Company of Nevada, from dredging and cutting a canal across property owned by them in the city of Richmond, Cal., and awarding damages. The bill alleged that complainant's testator at the time of his death was seised of certain described lands, and that about April 15, 1915, defendant trespassed by beginning to dredge a canal 80 feet in width and 8 feet in depth for a distance of from 4,000 to 5,000 feet across the land of testator. Defendant denied seisin or possession by plaintiffs, and alleged that the land described was a navigable waterway, with a public terminus connecting the city of Richmond with San Pablo and San Francisco Bays, and that at no time had plaintiffs or their testator had title to the land covered by the waters of the channel; that on the 15th of March, 1915, the defendant entered into a contract with the city of Richmond, wherein defendant agreed to dredge a channel through the south channel of San Pablo Canal, and that such work was commenced in April, 1915, for the purpose of improving the waterway in the interests of commerce and navigation. The city of Richmond intervened, and alleged the existence of a navigable channel within the limits of the city, and that the best interests of the city required the improvement of its navigability; permission to make such improvements having been received from the War Department of the United States. Plaintiffs denied the navigability or commercial character of the channel, and alleged that the intervener and the Standard Oil Company of California have entered into a contract whereby the city of Richmond would cause the soil dredged from the property of plaintiffs to be deposited upon the property of the Standard Oil Company, the latter agreeing to pay the city of Richmond therefor, and that if the channel is deepened in accordance with the contract between the intervener and defendant it will enable the Standard Oil Company to obtain a waterway to San Pablo Bay across the land and property of plaintiffs.

The turning point in the case is whether or not the waterway involved is navigable. It was the opinion of the District Court that it was not; that it never had been in fact navigable in any true sense, and has not been considered, either by the public or by the authorities of the state of California, as capable of navigation; and, furthermore, that the works sought to be prosecuted could not be carried on without ar-

tificial aid.  Before reaching this conclusion, and in order to get a better understanding of the evidence bearing upon the physical situation, the District Judge made a personal inspection of the lands and channel involved in the controversy, and with painstaking care has described the situation, substantially as follows:

[1] The channel involved is about a mile in length, running through a tract of salt marsh or tideland, comprising about 500 acres, with the northerly boundary on San Pablo Bay and extending southerly for a mile, more or less, between a natural waterway called San Pablo creek, which borders on the east, the "Potrero" constituting the San Pablo peninsula on the west.  The land was acquired by plaintiffs' grandfather by grant from those holding under the state Tideland Act.  It is subject to tide action, largely submerged at flood tide, and mostly exposed at its lower stages.  It is intersected by tidal sloughs cut by the flux and recession of the waters of the bay in their diurnal flow, some of them of magnitude and others dwindling to rivulets; at high tide many of these sloughs have considerable water, and at low tide the mud bottom is practically exposed.  The particular channel in controversy branches from a larger stream a short distance south from where the San Pablo creek debouches from the marsh land into San Pablo Bay, and thence it winds its way throughout the length of the tract of 500 acres.  The channel varies in width and depth from 100 feet or over in its lower reaches, and narrowing farther south, with a depth varying with the tide from 2 feet or less at low tide in its shallowest parts toward the south to approximately 7 or 8 feet at its flood, and deepening as it flowes to its mouth enters the San Pablo Canal. When the predecessors of the plaintiff acquired these tidelands, and for years thereafter, there was no settlement in the immediate neighborhood; the lands being largely used for farming and grazing.  Years ago plaintiffs' grandfather built a dike across the lands near the northern boundary to keep out the tide and render the land more available for pasturage.  This dike, except for a tide gate, was built solidly across the channel involved herein, and was maintained up to 1901 in a way to restrain the influx of the tide and to make the lands more available for pasturage.  To a great extent the dike has disappeared, but evidences of it now exist.

The San Pablo Canal has always been navigated to some extent, but the channel in controversy and other sloughs intersecting the land have never been used or regarded as available for any kind of navigation, other than for duck boats or punts for hunting and fishing.  About 1900 the Santa Fé Railroad selected Point Richmond as a terminus on San Francisco Bay, and the city of Richmond began to grow.  The city is described as built upon the high land southerly and westerly of the marsh lands in question; the high land extending northerly in a peninsula terminating in San Pablo Point, partly dividing the waters of San Pablo Bay from the Bay of San Francisco.  The corporate limits of the city of Richmond have extended to include this body of tidelands, but the latter is unreclaimed and unimproved, except by the Standard Oil Company, which has a refining plant at Richmond.  The site of the refining plant includes a portion of marsh land purchased

from plaintiffs' testator from the southerly end of the tract hereinbefore described. When the plant was built, the slough or channel involved continued into the portion of the marsh acquired by the Oil Company, and somewhat recently the Oil Company has built a levee across the channel, and along the northern boundary of its marsh lands, and has filled in the channel where it crosses the lands of the company. North of the marsh land sold to the Standard Oil Company is a strip of land about 200 feet wide, sold by the predecessors of the plaintiff to the Belt Line Railroad. This narrow strip, running across the marsh between the lands of the Oil Company and the present holdings of the plaintiffs, forms the southerly boundary of the latter and the northerly boundary of the former.

The court found that it was only after the Oil Company had established its works that any effort was made to navigate the channel by craft or burden; that occasionally power boats and scows of light draft have been taken up through San Pablo creek into the channel involved, on the flood tide, but that it was impracticable to put the channel to such use without deepening it for the purpose. About 1915 an arrangement was made between the Oil Company and the city of Richmond, whereby the city agreed to pay the defendant to dredge the channel, and the Oil Company, in consideration of the removed soil being put on its land within its levee or bulkhead, agreed to pay the city for the material. Proceeding upon the theory that the channel was a public navigable waterway, a permit from the War Department of the United States was procured to enable the work to be prosecuted.

Upon these facts, which are supported by substantial evidence, the court was right in holding that the channel was not a navigable waterway. While any very exact rule cannot be stated, we find that the Court of Appeals for the Eighth Circuit, in Harrison v. Fite, 148 Fed. 781, 78 C. C. A. 447, has cited many cases to uphold the test it has expressed in this way:

"To meet the test of navigability as understood in the American law, a water course should be susceptible of use for purposes of commerce or possess a capacity for valuable floatage in the transportation to market of the products of the country through which it runs. It should be of practical usefulness to the public as a public highway in its natural state and without the aid of artificial means. A theoretical or potential navigability, or one that is temporary, precarious, and unprofitable, is not sufficient. While the navigable quality of a water course need not be continuous, yet it should continue long enough to be useful and valuable in transportation; and the fluctuations should come regularly with the seasons, so that the period of navigability may be depended upon. Mere depth of water, without profitable utility, will not render a water course navigable in the legal sense, so as to subject it to public servitude, nor will the fact that it is sufficient for pleasure boating or to enable hunters or fishermen to float their skiffs or canoes. To be navigable, a water course must have a useful capacity as a public highway of transportation. Toledo Liberal Shooting Co. v. Erie Shooting Club, 33 C. C. A. 233, 90 Fed. 680; Moore v. Sanborne, 2 Mich, 520, 524, 59 Am. Dec. 209; Morgan v. King, 35 N. Y. 454, 458, 91 Am. Dec. 58; Brown v. Chadbourne, 31 Me. 9, 1 Am. Rep. 641 [50 Am. Dec. 641]; Griffith v. Holman, 23 Wash. 347, 63 Pac. 339 [83 Am. St. Rep. 821]; Wethersfield v. Humphrey, 20 Conn. 218; Rowe v. Granite Bridge, 38 Mass. [21 Pick.] 344; Gaston v. Mace, 33 W. Va. 14, 10 S. E. 60; 5 L. R. A. 392, 25 Am. St. Rep. 848; Neaderhouser v. State, 28 Ind. 257; Rhodes v. Otis, 33 Ala. 578, 73 Am. Dec. 439; Railroad v. Brooks, 39 Ark. 403, 43 Am. Rep. 277."

Chisholm v. Caines (C. C.) 67 Fed. 285, cited by appellants, does not conflict with the quotation from Harrison v. Fite, supra.

We need not go into a discussion of the differences in the testimony of the witnesses. It is fair to say that there were some disagreements between them, particularly in respect to the capacity of the waterway, but, as already said, we accept the conclusions of the lower court as to the facts. Estep v. Kentland Coal & Coke Co., 239 Fed. 617, 152 C. C. A. 451; Ebner Gold Mining Co. v. Alaska Juneau G. M. Co., 210 Fed. 599, 127 C. C. A. 235.

[2] The question of title of the lands, including the soil underlying the channel itself, was clearly correctly decided upon the authority of Knudson v. Kearney, 171 Cal. 250, 152 Pac. 541.

Affirmed.