**GULF & I. RY. CO. OF TEXAS et al. v. DAVIS, Secretary of War, et al.**

District Court, S. D. Texas, at Galveston.
June 7, 1928.

No. 179.

**1. Commerce ☞18—Where stream has not been used in commerce, commerce actually in esse or in posse is essential to "navigability."**

Where stream has never been impressed with character of navigability by past use in commerce, commerce actually in esse, or at least in all reasonable possibility in posse, is essential to "navigability"; power of Congress over such streams springs as an incident to general power to regulate commerce, and springs in aid of commerce, past, present, or actively potential.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Navigable.]

**2. Navigable waters ☞1(1)—Artificially contrived navigability by construction of waterway is not navigability, within act relating to altering bridge obstructing navigation (33 USCA § 502).**

Artificially contrived navigability, by construction of inland waterway, does not bring stream within Act March 3, 1899, § 18 (33 USCA § 502; Comp. St. § 9970), relating to altering bridge obstructing navigation.

**3. Navigable waters ☞1(7), 20(6)—Evidence held to show that stream was not navigable, and hearing and notice by authority of Secretary of War regarding altering bridge was void (33 USCA § 502).**

Evidence *held* to show that stream over which no trade or commerce had ever been or in all probability ever would be conducted was not navigable in fact, and therefore not navigable in law, and hearing and notice given by authority of Secretary of War regarding altering bridge, under Act March 3, 1899, § 18 (33 USCA § 502; Comp. St. § 9970), was without authority and void.

**4. Injunction ☞105(1)—Railroad held entitled to injunction against government officials from prosecuting railroad for failure to alter bridge across nonnavigable stream (33 USCA § 502).**

Where evidence showed that stream was not navigable, railroad company, whose railroad crossed stream, *held* entitled to injunction against government officials from interfering with, prosecuting, or causing railroad company to be prosecuted for failure to alter bridge, under Act March 3, 1899, § 18 (33 USCA § 502; Comp. St. § 9970).

In Equity. Suit by the Gulf & Interstate Railway Company of Texas and another against Dwight F. Davis, Secretary of War, and others. Decree in accordance with opinion.

Terry, Cavin & Mills and Ballinger Mills, all of Galveston, Tex., for plaintiffs.

H. M. Holden, U. S. Atty., and Howell Ward, Asst. U. S. Atty., both of Houston, Tex., for defendants.

HUTCHESON, District Judge. Plaintiffs bring their petition against Dwight F. Davis, Secretary of War, Julien L. Schley, resident engineer, and H. M. Holden, United States district attorney, alleging that heretofore plaintiff Gulf & Interstate Railway had operated a line of railroad between the city of Galveston and the city of Beaumont under the authority of the state of Texas so to do; that on July 1, 1914, they had leased said line of railroad to plaintiff Gulf, Colorado & Santa Fé Railway Company, under legislative authority; that the railroad crosses a certain water course commonly known and designated as Mud Bayou, the bottom stringers of the bridge across Mud Bayou being 3.7 feet above mean low tide, and 1.5

feet above mean high tide; that said bridge has been continuously maintained and operated in approximately the same condition since its construction in 1896; that in April, 1927, a notice was served upon plaintiffs by Julien L. Schley, district engineer, for a public hearing upon the possible need for the alteration of the bridge of the Gulf & Interstate Railroad across Mud Bayou to provide for the Intercoastal Waterway, Sabine river to Galveston section; that at the time of the hearing evidence was presented showing that Mud Bayou was not a navigable stream, and was not a part of the navigable waters of the United States, and that no evidence whatsoever to the contrary was introduced in said hearing; that thereafter, on September 21, 1927, a notice was served on plaintiff Gulf, Colorado & Santa Fé Railway Company by Hanford McNider, Acting Secretary of War, to alter the bridge so as to provide "a draw with unlimited vertical clearance, and a horizontal clearance between fenders of 80 feet to the center line of the channel," the notice requiring one year from that date for the completion of said bridge; that the alteration of the bridge as required would cause an expenditure of over $200,000, with operating charges of over $9,000 per year; that section 18 of the Act of March 3, 1899 (33 USCA § 502; Comp. St. § 9970), under which the proceedings taken by the War Department purported to be authorized, has no application to the stream in question, because the same is a nonnavigable waterway.

Plaintiffs then allege: "Mud Bayou is not a navigable waterway of the United States. It is not used, and never has been used, and is not susceptible of use, in its natural and ordinary condition as a highway for commerce over which trade and travel are or may be conducted in the customary modes of trade and travel on water. It is a crooked, sinuous, winding stream, over which no character or trade or commerce has ever been conducted. It has its origin in what is called Mud Lake, some distance to the east of the bridge mentioned. Mud Lake is simply a shallow depression in the marsh that rainwater collects in at times after heavy rains. The whole country from Mud Lake to the mouth of Mud Bayou is nothing but a marsh, entirely uninhabited, producing no article of commerce, and is fit for nothing but the winter pasture of cattle. Mud Bayou, from its source down to its mouth, is nothing more than a drain for said marsh. The entire course of Mud Bayou lies wholly within the State of Texas. It is in no way nor manner in its natural state a possible avenue of interstate or foreign commerce. It has never been used for the transportation of or any purpose in connection with, interstate or foreign commerce and is not in its natural state susceptible or capable of such use." And further that because of the notice issued by the Secretary of War, and the position taken by the government engineers, the plaintiffs are in danger of constant and repeated prosecution; the statute providing for continuous prosecution for each month of delay—concluding with a prayer for injunction against the Secretary of War, the resident engineer and the United States district attorney from requesting, instructing or prosecuting any proceedings against the plaintiffs on account of their failure to construct the bridge as requested.

The defendants answered, admitting all of the allegations of plaintiffs' bill, except those which declare that Mud Bayou is not a navigable stream; the answer alleging: "Mud Bayou has heretofore been used as a highway for commerce, and is now susceptible in its ordinary and natural condition as a highway for interstate commerce."

The issues having been joined, the case was fully heard on oral evidence, which established beyond question that the stream is not now being used, never has been used, and there is no probability of its ever being used, in its natural condition, as a highway for commerce over which trade and travel are or will be conducted in the customary modes of trade or travel on water. But the government contends that it is susceptible of use for the purposes of navigation, and that that susceptibility is such as to make it a navigable water of the United States within the meaning of the decisions.

Both plaintiffs and defendants rely with equal confidence upon the statement in The Daniel Ball, 10 Wall. 563, 19 L. Ed. 999— "Those rivers must be regarded as public, navigable rivers in law which are navigable in fact; and they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States, within the meaning of the acts of Congress, in contradistinction from the navigable waters of the states, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other states or foreign

countries in the customary modes in which such commerce is conducted by water."

Plaintiffs declare that the controlling factor in the determination of the question is the presence or absence of commerce, actual or potential; defendants, the presence or absence of water capable of bearing commerce, should any arise; and it is this difference in emphasis, and not any dispute of fact, which makes the controversy between the litigants, and furnishes the only difficulty in determining it. Here the facts are all one way. The stream is, as alleged by plaintiffs, "a crooked, sinuous, winding, and narrow stream over which no character of trade or commerce has ever been, or in all probability ever will be, conducted. It has its origin in what is called Mud Lake, some few miles to the east of the bridge mentioned. Mud Lake is simply a shallow depression in the marsh, that rainwater collects in at times after heavy rains. The whole country from Mud Lake to the mouth of the bayou is nothing but a marsh, entirely uninhabited, providing no article of commerce, and fit for nothing but the pasturage of cattle. Mud Bayou from its source down to its mouth is nothing but a mere drain for the marsh. The entire course of Mud Bayou lies wholly within the state of Texas. It is not in any way or manner, nor has it ever been, nor in all probability will it ever be, an avenue of interstate or foreign commerce, because there has never been any interstate or foreign commerce carried on or to be carried over it, and in the absence of some changes in its condition, or in the condition of the surrounding country, it will never be.

Plaintiffs offered the testimony of Mr. White, who stated that he had lived all of his life within about 14 miles of Mud Bayou; that he was 70 years old, and had known the country for 60 years; that there had never been any use of Mud Bayou by boats, never been any people living on or around Mud Bayou, and that there had never been any use of the country at that point, except for grazing cattle; that he had never heard of it being a navigable stream, had never seen any goods or merchandise taken up the stream, and had never heard of any. No other witness, either for the plaintiffs or the defense, disputed this testimony, except that one witness stated that a small boat had gone up to the bridge with some ties on it, that had been washed off of the bridge and track during the 1900 storm.

The only testimony as to navigation at all in that vicinity was the testimony that East Bay Bayou, into which Mud Bayou empties, had been navigated to a point about 6 miles by water below the bridge for the purpose of supplying a settlement called High Island; that no navigation had ever gone above that point, and that there had never been anything in Mud Bayou, or any part of it, to call for or justify navigation.

Defendants concede these facts, but declare it to be established by the decisions that navigability cannot be tested alone by the past or the present; that it must be tested by the future as well, and that, if the stream in question contains sufficient water to carry commerce over it, it must be held to be potentially navigable, and protected against the time when commercial conditions shall make it actually available. They refer to expressions in Economy Light & Power Co. v. United States, the Desplaines River Case (C. C. A.) 256 F. 793: "We think streams of actual navigable capacity, but not now used for interstate commerce, are within congressional power to preserve for * * * future transportation, and that the Act of 1899 applies to such streams."

They quote from the same case in the Supreme Court, 256 U. S. 113, 41 S. Ct. 409, 65 L. Ed. 847: "We cannot limit" the prohibition of the statute "to such navigable waters as were, at the time of its passage, or now are, actually open for use."

From The Montello, 20 Wall. 441, 22 L. Ed. 391: "It would be a narrow rule to hold that in this country, unless a river was capable of being navigated by steam or sail vessels, it could not be treated as a public highway. The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river, rather than the extent and manner of that use."

From United States v. Holt Bank, 270 U. S. page 57, 46 S. Ct. 199 (70 L. Ed. 465): "Merchants in the settlements at Liner and Grygla, which were several miles up Mud river from the lake, used the river and lake in sending for and bringing in their supplies. True, the navigation was limited, but this was because trade and travel in that vicinity were limited. In seasons of great drought there was difficulty in getting boats up the river and through the lake, but this was exceptional, the usual conditions being as just stated."

And on page 56 (46 S. Ct. 199): "Navigability does not depend on the particular mode in which such use is or may be had * * * nor on an absence of occasional difficulties in navigation, but on the fact, if

it be a fact, that the stream in its natural and ordinary condition affords a channel for useful commerce."

Upon these authorities defendants declare that, since the facts establish, as they do, that there is water enough in Mud Bayou to support water-borne commerce in boats of light draft up to the railroad bridge and above, if there were any to go there, and that this Mud Bayou empties into East Bay Bayou, East Bay Bayou into East Bay, and East Bay into the Gulf of Mexico, so that the stream in question has connection, immediate and practical, with a recognized highway of commerce, interstate and foreign, a finding is required that, though it has not in the past been navigated, and is not now being navigated, it is a navigable stream, because it is capable of use by the public for the purposes of transportation and commerce, whenever such transportation and commerce become available.

Plaintiffs, on the other hand, while admitting that as a matter of fact boats of light draft could conduct commerce over Mud Bayou and beyond the bridge, if there was any commerce actual or potential, to be conducted, declare that while the presence of sufficient water in the stream to support water-borne commerce is important, where the evidence shows that there is commerce in esse or in posse to be conducted, it is of no significance where the facts establish not merely that there is no commerce and has been no commerce, but that in all probability there will in fact never be any, and this they say they have affirmatively established.

[1] Plaintiffs say that the rule has never been better stated than in Harrison v. Fite (C. C. A.) 148 F. 783, quoted with approval in North American Dredging Co. v. Mintzer (C. C. A.) 245 F. 297, 309.[1] That plaintiffs

are right in insisting, where a stream has never been impressed with the character of navigability by past use in commerce, that commerce actually in esse or at least in all reasonable possibility in posse is essential to navigability, I think cannot be doubted. Not only do the authorities bear out this view, but a consideration of the source of the power of Congress over such streams further removes the matter from doubt. That power derives not from an express grant in the Constitution; it springs as an incident to the general power to regulate commerce, and being incidental springs, and only springs, in aid of commerce past, present, or actively potential.[2]

If the matter of navigability vel non is examined from this viewpoint, the apparent discrepancies in and difficulties springing from the various cases will I think disappear. It is because of the controlling character of the factor of commercial use that the Supreme Court, in the Desplaines River Case, supra, declared navigable a stream

---

men to float their skiffs or canoes. To be navigable a water course must have a useful capacity as a public highway of transportation. Toledo Liberal Shooting Co. v. Erie Shooting Club, 33 C. C. A. 233, 90 F. 680; Moore v. Sanborne, 2 Mich. 520, 524, 59 Am. Dec. 209; Morgan v. King, 35 N. Y. 454, 458, 91 Am. Dec. 58; Brown v. Chadbourne, 31 Me. 9 [50 Am. Dec.] 1 Am. Rep. 641; Griffith v. Holman, 23 Wash. 347, 63 P. 239 [54 L. R. A. 178, 83 Am. St. Rep. 821]; Wethersfield v. Humphrey, 20 Conn. 218; Rowe v. Granite Bridge, 38 Mass. [21 Pick.] 344; Gaston v. Mace, 33 W. Va. 14, 10 S. E. 60, 5 L. R. A. 392, 25 Am. St. Rep. 848; Neaderhouser v. State, 28 Ind. 257; Rhodes v. Otis, 33 Ala. 578, 73 Am. Dec. 439; Railroad v. Brooks, 39 Ark. 403, 43 Am. Rep. 277."

[2] "It is a safe inference from these and other cases to the same effect, * * * that the term 'navigable waters of the United States' has reference to commerce of a substantial and permanent character to be conducted thereon. The power of Congress to regulate such waters is not expressly granted in the Constitution, but is a power incidental to the express 'power to regulate commerce with foreign nations, and among the several States and with the Indian tribes.' * * * While, therefore, it may not be easy for a court to define the size and character of a stream which would place it within the category of 'navigable waters of the United States, or to define what traffic shall constitute 'commerce among the states,' so as to make such questions sheer matters of law, yet, in construing the legislation involved in the case before us, we may be permitted to see that it was not the intention of Congress to interfere with or prevent the exercise by the State of Louisiana of its power to reclaim swamp and overflowed lands by regulating and controlling the current of small streams not used habitually as arteries of interstate commerce." Leovy v. United States, 177 U. S. 632, 20 S. Ct. 801, 44 L. Ed. 914.

---

[1] "To meet the test of navigability as understood in the American law, a water course should be susceptible of use for purposes of commerce, or possess a capacity for valuable floatage in the transportation to market of the products of the country through which it runs. It should be of practical usefulness to the public as a public highway in its natural state and without the aid of artificial means. A theoretical or potential navigability, or one that is temporary, precarious, and unprofitable, is not sufficient. While the navigable quality of a water course need not be continuous, yet it should continue long enough to be useful and valuable in transportation; and the fluctuations should come regularly with the seasons, so that the period of navigability may be depended upon. Mere depth of water, without profitable utility, will not render a water course navigable in the legal sense, so as to subject it to public servitude, nor will the fact that it is sufficient for pleasure boating or to enable hunters or fisher-

which had constituted an avenue of commerce, though it had been out of use for 100 years, and it was the same consideration which in The Montello, supra, enabled the court to say that Fox river, and in United States v. Holt Bank that Mud Lake, which in spite of difficulties in the way of their navigation, had actually been navigated in the commerce of the country, were navigable.[3]

It is the emphasis upon this view which enabled the Supreme Court, in Leovy v. United States, 177 U. S. 621, 20 S. Ct. 797, 44 L. Ed. 914, to declare nonnavigable, in the face of the verdict of a jury that it was navigable, a crevasse along the Mississippi river. In that case the Supreme Court disapproved the instructions of the trial judge that a navigable water is one which either of itself, or in connection with other waters, permits a continuous journey to another state.[4]

And it was this same view which enabled the Supreme Court in Oklahoma v. Texas, 258 U. S. 577, 42 S. Ct. 413 (66 L. Ed. 771), to say of the stream there in question: "Its characteristics are such that its use for transportation has been and must be exceptional, and confined to irregular and short periods of temporary high water. A greater capacity for practical and beneficial use in commerce is essential to establish navigability"—citing and approving Leovy v. United States, 177 U. S. 621, 20 S. Ct. 797, 44 L. Ed. 914; Harrison v. Fite (C. C. A.) 148 F. 781; North American Dredging Co. v. Mintzer (C. C. A.) 245 F. 297.

The application of this point of view to this case makes its solution easy. There has not been, and is not now, any commerce upon Mud Bayou. No stretch of the most vivid imagination can envision conditions under which it will be, in its natural state, an aid to commerce.

[2] The particular demand upon the plaintiffs for the erection of a drawbridge, which has caused this litigation, was not made in order to assist the passage of commerce, seeking the use of the stream in its natural and ordinary condition, but because the inland waterway which was being constructed overland required an underpass, and it was desired to avoid having this underpass constructed at the cost of the waterway. That such artificially contrived navigability does not bring a stream within the act the authorities all make clear.

[3, 4] From the finding, which the evidence requires, that the stream is not navigable in fact, and therefore not navigable in law, it follows that the hearing and notice given by authority of the Secretary of War is without authority and void, and that plaintiffs are entitled to an injunction against

[3] "The true test of the navigability of a stream does not depend on the mode by which commerce is, or may be, conducted, nor the difficulties attending navigation. If this were so, the public would be deprived of the use of many of the large rivers of the country over which rafts of lumber of great value are constantly taken to market. It would be a narrow rule to hold that in this country, unless a river was capable of being navigated by steam or sail vessels, it could not be treated as a public highway. The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river, rather than the extent and manner of that use. If it be capable in its natural state of being used for purposes of commerce, no matter in what mode the commerce may be conducted, it is navigable in fact, and becomes in law a public river or highway. Vessels of any kind that can float upon the water, whether propelled by animal power, by the wind, or by the agency of steam, are, or may become, the mode by which a vast commerce can be conducted, and it would be a mischievous rule that would exclude either in determining the navigability of a river. It is not, however, as Chief Justice Show said, 'every small creek in which a fishing skiff or gunning canoe can be made to float at high water which is deemed navigable, but, in order to give it the character of a navigable stream, it must be generally and commonly useful to some purpose of trade or agriculture.'" The Montello, 20 Wall. 441, 22 L. Ed. 391.

[4] "If these instructions were correct, then there is scarcely a creek or stream in the entire country which is not a navigable water of the United States. Nearly all the streams on which a skiff or small lugger can float discharge themselves into other streams or waters flowing into a river which traverses more than one state, and the mere capacity to pass in a boat of any size, however small, from one stream or rivulet to another, * * * is [not] sufficient to constitute a navigable water of the United States. Such a view," the court said,

"would extend the paramount jurisdiction of the United States over all the flowing waters in the states. * * * When it is remembered that the source of the power of the general government to act at all in this matter arises out of its power to regulate commerce with foreign countries and among the states, it is obvious that what the Constitution and the acts of Congress have in view is the promotion and protection of commerce in its international and interstate aspect, and a practical construction must be put on these enactments as intended for such large and important purposes." They declare: "We think the defendant was entitled to the instruction asked for, but refused, that the jury should be satisfied from the evidence that Red Pass was at the time it was closed, as alleged in the indictment, substantially useful to some purpose of interstate commerce." Leovy v. United States, 177 U. S. 621, 20 S. Ct. 797, 44 L. Ed. 914.

the defendants from interfering with, prosecuting, or causing them to be prosecuted on account of the construction and maintenance of the bridge.

The decree should, however, be held open for application and orders at the foot of it, should changed conditions in future make the stream in fact, and therefore in law, navigable.