## UNITED STATES v. DOUGHTON et al.
### No. 3321.

Circuit Court of Appeals, Fourth Circuit.

Jan. 10, 1933.

J. Frank Staley, of Washington, D. C. (W. H. Fisher, U. S. Atty., of Clinton, N. C., on the brief), for the United States.

Charles Ross, of Raleigh, N. C. (Dennis G. Brummitt, Atty. Gen., on the brief), for appellees.

Before PARKER and SOPER, Circuit Judges, and PAUL, District Judge.

PARKER, Circuit Judge (after stating the facts as above).

█ The regulatory power of the federal government over the navigable waters of the United States rests upon section 8, subd. 3 of article 1 of the Constitution, which authorizes Congress "to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Gibbons v. Ogden, 9 Wheat. 1, 194, 6 L. Ed. 23. And it is well settled that the power of Congress over waters which are susceptible of being used in their ordinary condition as highways for interstate or foreign commerce is plenary. The Daniel Ball, 10 Wall. 557, 19 L. Ed. 999; The Montello, 20 Wall. 430, 22 L. Ed. 391; U. S. v. Holt State Bank, 270 U. S. 49, 56, 46 S. Ct. 197, 70 L. Ed. 465.

█ On the other hand, it is not sufficient to bring a stream under the regulatory power of Congress that it merely be susceptible of some sort of navigation. If this were true, there is scarcely a creek or stream in the United States that would not be a navigable water of the United States or that could be bridged by the state highways or the railroads without the approval of the Secretary of War. Congress would thus be enabled under the commerce clause to exercise control over internal affairs of the states in relation to streams where interstate commerce has no existence, actual or potential; and the states would be deprived of vital power in regulating matters of domestic concern, having no relation to commerce. This would clearly contravene the whole theory of the Constitution as to the division of the powers of sovereignty between state and national governments. We think that the true rule is that, to come within the regulatory power of Congress, the stream must be susceptible in its natural condition of becoming a highway of interstate or foreign commerce; i. e., it must be of such a nature and so situated that there is at least a practical possibility of its being used as a highway for such commerce; for, as has been said, the power of Congress over navigable waters of the United States, arising as it does under the commerce clause of the Constitution, "has reference to commerce of a substantial and permanent character to be conducted thereon." Leovy v. U. S., 177 U. S. 621, 20 S. Ct. 797, 801, 44 L. Ed. 914; Healy v. Joliet & Chicago R. Co., 116 U. S. 191, 6 S. Ct. 352, 29 L. Ed. 607; Oklahoma v. Texas, 258 U. S. 574, 591, 42 S. Ct. 406, 66 L. Ed. 771; Brewer-Elliott Oil & Gas Co. v. U. S., 260 U. S. 77, 86, 43 S. Ct. 60, 67 L. Ed. 140; Harrison v. Fite (C. C. A. 8th) 148 F. 781, 783; Toledo Liberal Shooting Co. v. Erie Shooting Club (C. C. A. 6th) 90 F. 680; Gulf & I. R. Co. v. Davis (D. C.) 26 F.(2d) 930, affirmed (C. C. A. 5th) 31 F. (2d) 109; Rowe v. Granite Bridge Corp., 21 Pick. (Mass.) 344; Wethersfield v. Humphrey, 20 Conn. 227; North American Dredging Co. of Nevada v. Mintzer (C. C. A. 9th) 245 F. 297, 300. We are not here considering the power of Congress to regulate the flow of nonnavigable streams which are tributary to those that are navigable, as to which we express no opinion.

The case of Leovy v. U. S., supra, is squarely in point on the question here involved. In that case defendant had been convicted of obstructing Red Pass, a stream which flowed into the Gulf of Mexico and connected with a navigable stream of the United States known as the "Jump," which was an outlet of the Mississippi river into the Gulf of Mexico. "A few fishermen testified that they occasionally went through this pass with small vessels, carrying oysters for planting, and one or two cargoes of willows and timber were spoken of." The trial court charged the jury, what in effect is the contention of the government here, that, if the pass was navigable and connected with waters that permitted a journey to another state, it was a navigable water of the United States. The Supreme Court held this instruction to be erroneous, and, after reviewing the decisions in The Daniel Ball, supra, The Montello, supra, and Withers v. Buckley, 20 How. 84, 15 L. Ed. 816, the court, using the language above quoted, said that "navigable waters of the United States," as defined in these cases, "has reference to commerce of a substantial and permanent character to be conducted thereon." Commenting on the instruction to which we have referred, the court said:

"If these instructions were correct, then there is scarcely a creek or stream in the entire country which is not a navigable water of the United States. Nearly all the streams on which a skiff or small lugger can float discharge themselves into other streams or waters flowing into a river which traverses more than one state, and the mere capacity

to pass in a boat of any size, however small, from one stream or rivulet to another, the jury is informed, is sufficient to constitute a navigable water of the United States.

"Such a view would extend the paramount jurisdiction of the United States over all the flowing waters in the states, and would subject the officers and agents of a state, engaged in constructing levees to restrain overflowing rivers within their banks, or in regulating the channels of small streams for the purposes of internal commerce, to fine and imprisonment, unless permission be first obtained from the Secretary of War. If such were the necessary construction of the statutes here involved, their validity might well be questioned. But we do not so understand the legislation of Congress. When it is remembered that the source of the power of the general government to act at all in this matter arises out of its power to regulate commerce with foreign countries and among the states, it is obvious that what the Constitution and the acts of Congress have in view is the promotion and protection of commerce in its international and interstate aspect, *and a practical construction must be put on these enactments as intended for such large and important purposes.*

"We also think that these instructions are open to the further criticism that they *contain no reference to the nature or extent of the traffic or trade carried on in Red Pass before the erection of the dam. Indeed, the charge necessarily implies that the defendant was guilty if there was merely a capacity for passing from Red Pass into the Mississippi river on any sort of a boat.* Very different was the view expressed by Chief Justice Shaw when he said it is not 'every small creek in which a fishing skiff or gunning canoe can be made to float at high water, which is deemed navigable.' But in order to give it the character of a navigable stream it must be generally and commonly useful to some purpose of trade or agriculture. Rowe v. Granite Bridge Corp., 21 Pick. [Mass.] 344." (Italics ours.)

A case very similar to the case at bar is North American Dredging Co. of Nevada v. Mintzer, supra, in which the Circuit Court of Appeals of the Ninth Circuit held that a tidal slough was not navigable, even though it had been used by hunting and fishing boats and an oil company, which had a plant on adjoining lands, had on a few occasions taken powerboats and scows up the channel at flood tide. Judge Hunt, who wrote the opinion of the court, cited with approval the follow-

ing passage from the opinion of Judge Hook in Harrison v. Fite, supra, which we think is pertinent here, viz.:

"To meet the test of navigability as understood in the American law, a water course should be susceptible of use for purposes of commerce or possess a capacity for valuable floatage in the transportation to market of the products of the country through which it runs. It should be of practical usefulness to the public as a public highway in its natural state and without the aid of artificial means. *A theoretical or potential navigability, or one that is temporary, precarious, and unprofitable, is not sufficient.* While the navigable quality of a water course need not be continuous, yet it should continue long enough to be useful and valuable in transportation; and the fluctuations should come regularly with the seasons, so that the period of navigability may be depended upon. *Mere depth of water, without profitable utility, will not render a water course navigable in the legal sense,* so as to subject it to public servitude, nor will the fact that it is sufficient for pleasure boating or to enable hunters or fishermen to float their skiffs or canoes. *To be navigable, a water course must have a useful capacity* as a public highway of transportation." (Italics ours.)

In Gulf & I. R. Co. v. Davis (D. C.) 26 F. (2d) 930, 932, affirmed (C. C. A. 5th) 31 F. (2d) 109, there was involved, just as there is here, the question of a bridge over a stream utilized by an inland waterway of the government and the same controversy arose as to navigability of the stream in its natural state. Judge Hutcheson thus tersely stated the controversy, which is the same as that with which we have to deal: "Plaintiffs declare that the controlling factor in the determination of the question is the presence or absence of commerce, actual or potential; defendants, the presence or absence of water capable of bearing commerce, should any arise; and it is this difference in emphasis, and not any dispute of fact, which makes the controversy between the litigants, and furnishes the only difficulty in determining it."

In holding that the stream there in question was not navigable, Judge Hutcheson laid down what we regard as the correct rule, and showed that, if it be applied, apparent inconsistencies and discrepancies in the various cases will disappear. He said: "That plaintiffs are right in insisting, where a stream has never been impressed with the character of navigability by past use in commerce, that commerce actually in esse or at least in all

reasonable possibility in posse is essential to navigability, I think cannot be doubted. Not only do the authorities bear out this view, but a consideration of the source of the power of Congress over such streams further removes the matter from doubt. That power derives not from an express grant in the Constitution; it springs as an incident to the general power to regulate commerce, and being incidental springs, and only springs, in aid of commerce past, present, or actively potential."

The government relies particularly on expressions in the recent opinions in U. S. v. Holt State Bank, 270 U. S. 49, 46 S. Ct. 197, 70 L. Ed. 465, and U. S. v. Utah, 283 U. S. 64, 51 S. Ct. 438, 75 L. Ed. 844; but there is nothing in either of these cases to indicate that the Supreme Court intended to overrule or modify the rule as laid down in the Leovy Case. The former of these cases dealt with the title to the bed of Mud Lake in the state of Minnesota, the latter with the title to the beds of the Grand, Green, and Colorado rivers in the state of Utah; and the sole question in both cases was as to navigability, not as to whether the streams and waters in question were navigable waters of the United States subject to the control of Congress by virtue of the commerce clause of the Constitution. The distinction is made clear by Mr. Chief Justice Hughes in the following language (U. S. v. Utah, 283 U. S. at page 75, 51 S. Ct. 438, 440, 75 L. Ed. 844): "The question of navigability is thus determinative of the controversy, and that is a federal question. This is so, although it is undisputed that none of the portions of the rivers under consideration constitute navigable waters of the United States, that is, they are not navigable in interstate or foreign commerce, and the question is whether they are navigable waters of the State of Utah."

Applying these principles to the case at bar, we think that the learned judge below was clearly right in holding that Wilkerson creek was not one of the navigable waters of the United States and as such subject to the control of Congress. The fact that small boats had occasionally used it, that logs had been floated down on it from the swamp where they were cut, that supplies had been brought up on it to the road force, while that force was working in the neighborhood, and that on one occasion a houseboat used by government engineers had been carried up on it—all of these taken together fall far short of showing that this little creek, which was no more in fact than a drain for a swamp,

was a highway, or in its natural state capable of becoming a highway, of interstate or foreign commerce. If the government had not constructed the inland waterway canal through it, no one, we think, would have thought of regarding it as one of the navigable waters of the United States. There had certainly been no "commerce of a substantial and permanent character" conducted on it in the past, and in its natural condition there was no reasonable probability of such commerce arising at any time in the future.

There was no error, and the order dismissing the bill of complaint will be affirmed.

Affirmed.