320 So.2d 917 (1975)
SOUTHERN NATURAL GAS COMPANY, Plaintiff-Appellee,
v.
GULF OIL CORPORATION et al., Defendants-Appellants.
No. 5119.
Court of Appeal of Louisiana, Third Circuit.
October 2, 1975.
Rehearing Denied November 13, 1975.
*918 Caffery, Duhe & Davis, by Patrick T. Caffery, New Iberia, for defendants-appellants.
Landry, Watkins, Cousin & Bonin by William O. Bonin, New Iberia, for plaintiff-appellee.
Before HOOD, CULPEPPER and MILLER, JJ.
MILLER, Judge.
Defendants Gulf Oil Corporation and Berry Brothers General Contractors appeal a judgment awarding $15,802.74 to plaintiff Southern Natural Gas Company for property damages sustained when Berry's dredge picked up and ruptured Southern's natural gas pipeline. We affirm in part, and in part reverse.
Berry contracted with Gulf to "sweep" or re-dredge an existing canal leading from Big Bayou Pigeon to old locations and dredge a new canal and drill site as an extension of the canal. Southern's meter platform was located on the edge of the existing canal. From this point Southern's unmarked six-inch pipeline (which had not been used for five years) extends 395' along the canal at its approximate center at some points. The pipeline then turns ninety degrees and enters a pipeline ditch to ultimately form part of a "gas gathering system." Southern's pipeline construction and Berry's dredging operation were both pursuant to appropriate permits.
Representatives of Gulf and Berry made an on-site inspection of the area prior to commencing dredging operations. On August 29, 1972 Berry's dredge was towed to the canal and began its sweep at Big Bayou Pigeon. While staking the channel to be dredged the captain discovered Southern's meter platform and probed to determine whether the line from the platform crossed the canal. He found nothing because he didn't consider the possibility the line might meander along the center of the canal. The next morning the dragline bucket picked up the pipeline and ruptured it.
Defendants do not contest the trial court's holding them negligent. They specify as error the trial court's failure to find plaintiff negligent, the canal to be navigable, and to apply the doctrine of comparative negligence provided by the substantive law of admiralty.
The trial court properly set forth the test for navigable waterways as that prescribed in The Daniel Ball, 10 Wall. 557, 19 L.Ed. 999 (1871): waterways are ". . . highways for commerce over which trade and travel are or may be conducted in the customary modes of trade and travel on water." The scene of this accident accords with this definition in that navigability is the purpose for which the original canal was constructed and the present activity is intended to maintain. Cf., U.S. v. Sexton Cove Estates, Inc., 389 F.Supp. 602 (S.D.Fla.1975).
*919 The trial court was troubled by the possibility that private ownership of the canal might create an exception to exclude applicability of admiralty and maritime law. However, State and Federal jurisprudence uniformly reject this contention. In National Audubon Society v. White, 302 So.2d 660 (La.App. 3 Cir. 1974) we held the Mcllhenny canal retained its private character despite its navigability. In Dozvn Chemical Co. v. Dixie Carriers, Inc., 463 F.2d 120 (5th Cir. 1972), cert. denied 409 U.S. 1040, 93 S.Ct. 525, 34 L.Ed.2d 490 (1973), a private canal constructed by Dow for the sole purpose of transporting by barge materials between two of its plants in Houston, Texas was navigable and admiralty law was applied.
Although the damage sustained was beneath the surface of the water it was "damage caused by a vessel in navigation" on navigable waters and was within the intent of the Admiralty Extension Act, 46 U.S.C.A. § 740. A dredge barge is a "vessel in navigation." 2 Am.Jur.2d, § 33, note 12; 2 C.J.S. Admiralty § 28. Application of the substantive law of Admiralty is therefore required.
In determining the parties' negligence, the trial court found Gulf and Berry negligent in failing to check the public records for notice of the existence of a pipeline. Checking the records would have been a vain and useless act, because the only document of record relating to this pipeline was a map attached to Southern's application for a permit to build the main gas gathering line. The map did not show the location of the damaged line. It did not even show the canal. Tr. 212, 255. According to the evidence, there was nothing of record to show where Southern located its pipeline.
Since 1) Gulf and Berry did not examine the records and 2) their representatives knew of Southern's platform in the canal and that a pipeline ditch entered the canal at a point 395 feet from the platform, Southern's failure to place a description of record is only a nominal or minor fault. Admiralty law does not require a mechanical application of comparative negligence. Were this Southern's only fault it would have been properly excused from all fault.
Gulf and Berry contend Southern was negligent in laying the pipeline at or above  8.0 feet mean sea level in the canal and also in failing to post warning signs that the pipeline was below the water.
The trial court erred in holding Southern's compliance with the Corps of Engineers permit requirements in laying its line pretermits all questions concerning Southern's negligence in laying and marking its line. Tr. 397. Negligence does not solely depend on violation of a statute or rule. Jackson v. Jones, 224 La. 403, 69 So.2d 729 (1954); Traders & General Insurance Co. v. Robison, 289 So.2d 178 (La.App. 1 Cir. 1973). It follows that unreasonable conduct is not excused when one merely complies with minimum regulatory requirements. Admiralty has an applicable statutory expression of the same proposition in navigation rules. Observance of the rules will not excuse "neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case." International Rules, Rule 29, 33 U.S.C.A. § 147a; Harbors, Rivers and Inland Waters, Art. 29, 33 U.S.C.A. § 221.
If the purpose of the regulation had been to prevent dredging accidents, compliance might constitute a prima facie showing of due care. But no such purpose was shown.
More important, if compliance with the permit excuses plaintiff's unreasonable acts, defendants are also excused since this dredging was also conducted pursuant to a Corps of Engineers permit. Tr. 35.
We here consider the reasonableness or unreasonableness of Southern's *920 failure to mark the location of this unusually located pipeline. Southern knew the pipeline extended into and under the waterway. Tr. 206. They should have expected the waterway to be maintained by dredging from time to time. Southern expected development of the area as acknowledged by Southern's supervisor's testimony they had not abandoned the pipeline during its five year period of non-use. Tr. 180, 192. And it was established the usual depth of such canals is  8.0 feet.
Southern's representative testified that warning signs should be installed along the pipeline route (Tr. 210) but none were placed on this line. Reference is made to a "DANGER" sign on Southern's meter platform. Although the sign indicated the nature of the platform facility as a gas installation, it provided no warning of the nature or extent of underwater connections.
Finally, this pipeline had been damaged in a prior dredging accident. Tr. 242, 257. Under these circumstances, Southern's failure to remove the line or place adequate warning signs along the pipeline constitutes negligence on Southern's part.
Counsel for Southern correctly points out that minimum regulations (49 CFR 192) under the Gas Pipeline Safety Act (49 U.S.C.A. § 1671 et seq.) have not been extended beyond the populated areas which urgently require their protection. However, absence of regulation does not excuse unreasonable behavior any more than compliance with existing regulations might excuse such behavior. We therefore find Southern to have been substantially at fault.
Finally we consider the contention that Southern's negligence can be excused under the last clear chance doctrine, or the similar "major-minor fault" doctrine found in admiralty.
In the context of collision cases, last clear chance applies where the injured party was so clearly visible he must have been seen but for inattentiveness or failure to keep a proper lookout. This is not the case here. The pipeline was concealed beneath the water. There is evidence from which the existence of the line may be inferred and perhaps even its course under the water may have been determined. But where such inference is necessary to perceive the danger, it is not apparent in the sense required by the last clear chance doctrine. The cases cited by Southern are analyzed and distinguished on this same basis in Tiger Shipping Co. v. Tug Carville, 381 F.Supp. 1340 (E.D.Va.1974).
Furthermore, application of the doctrine would effectively penalize Gulf and Berry because their negligence was not greater. Cf., Jackson v. Continental Casualty Co., 308 So.2d 438 (La.App. 3 Cir. 1975).
Finding the parties equally at fault, the trial court judgment is amended so that Southern will sustain half the loss. As amended the trial court judgment is affirmed. Costs at trial are assessed half to plaintiff and half to defendants. Costs of this appeal are taxed to plaintiff.
Affirmed in part; in part, reversed and rendered.
HOOD, J., dissents and assigns written reasons.
HOOD, Judge (dissenting).
I do not agree that the canal involved in this case is a navigable waterway of the United States in the sense that it justifies the application of admiralty or maritime law.
The original grant of admiralty and maritime jurisdiction to the federal courts of the United States was made in Article 3, Section 2, of the United States Constitution, which provides:
"The judicial Power shall extend. . . to all Cases of admiralty and maritime Jurisdiction; . . ."
*921 Since that time, Congress has provided that the district courts of the United States shall have exclusive original jurisdiction of all civil cases of admiralty or maritime jurisdiction, "saving to suitors" all other remedies to which they are otherwise entitled. In that connection, 28 U.S.C.A., Section 1333, provides, in part, that:
"The district courts shall have original jurisdiction, exclusive of the courts of the States, of:
"(1) Any civil case of admiralty or maritime jurisdiction, saying to suitors in all cases all other remedies to which they are otherwise entitled . . ."
Congress has extended the admiralty and maritime jurisdiction of federal courts to include actions for damage or injury done or consummated on land, if the damage or injury was caused by a vessel on navigable water. 46 U.S.C.A., Section 740, provides that:
"The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land. . . ."
In order for a party to establish admiralty jurisdiction under 46 U.S.C.A., Section 740, it is necessary for him to show that the damage or injury was caused by a vessel "on navigable water," or on a "navigable waterway of the United States."
The most often cited definition of what constitutes "navigable waterways of the United States" is set out in the landmark case of The Daniel Ball v. United States, 10 Wall. 557, 19 L.Ed. 999 (1870), where the United States Supreme Court said:
"Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the Acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water." (Emphasis added).
In the cited case, The Daniel Ball was a 123-ton steam propelled vessel which was engaged as a common carrier, transporting merchandise and passengers regularly on Grand River, between the cities of Grand Rapids and Grand Haven, in the State of Michigan. It was being operated without a license. Federal laws prohibited the operation of a steam propelled vessel on "navigable waters of the United States" without a license, and a libel was filed against that ship to recover the penalty provided by law. The issue presented was whether the common law doctrine of navigability, based on the ebb and flow of the tide, was applicable, or whether some other test should be used to determine what is a navigable water of the United States. The court concluded that the common law test should not be used, but instead that the above quoted rule should be applied. The court found, upon applying that rule, that Grand River was a navigable waterway of the United States, since it was capable of bearing a 123-ton ship laden with merchandise and passengers a distance of at least 40 miles from its mouth in Lake Michigan, and since it was capable of and was actually being used in interstate and foreign commerce. With reference to the nature of that water, the court said:
". . . And by its junction with the lake it forms a continued highway for *922 commerce, both with other States and with foreign countries, and is thus brought under the direct control of Congress in the exercise of its commercial power."
The definition of "navigable water," as laid down in The Daniel Ball, has been cited with approval repeatedly at all levels of appellate review for 105 years.
For a waterway to fall within the established definition of a waterway of the United States, it must be shown that it is capable of valuable public use in its natural condition, and that it has a capacity for useful interstate or foreign commerce of a substantial and permanent nature. See United States v. State of Oregon, 295 U.S. 1, 55 S.Ct. 610, 79 L.Ed. 1267 (1935); United States v. Cress, 243 U.S. 316, 37 S. Ct. 380, 61 L.Ed. 746 (1916); Leovy v. United States, 177 U.S. 621, 20 S.Ct. 797, 44 L.Ed. 914 (1899). Occasional or exceptional use under abnormal conditions will not suffice, nor will a mere theoretical navigability or one that is temporary or unprofitable be sufficient. United States v. Doughton, 62 F.2d 936 (4 Cir. 1933).
In order for a waterway to be classified as a "highway of commerce," within The Daniel Ball definition, the commerce must be of a substantial and permanent character. Leovy v. United States, supra; Healy v. Joliet & Chicago R. Co., 116 U.S. 191, 6 S.Ct. 352, 29 L.Ed. 607 (1886); State of Oklahoma v. State of Texas, 258 U.S. 574, 42 S.Ct. 406, 66 L.Ed. 771 (1922); Brewer-Elliott Oil & Gas Co. v. U. S., 260 U.S. 77, 43 S.Ct. 60, 67 L.Ed. 140 (1922); Harrison v. Fife, 148 F. 781 (C.C.A.8 Cir. 1906); Toledo Liberal Shooting Co. v. Erie Shooting Club, 90 F. 680 (C.C.A. 6 Cir. 1898); Gulf & I. Ry. Co. of Texas v. Davis, 26 F.2d 930 (S.D.Tex.1928); Rowe v. Granite Bridge Corp., 21 Pick. (Mass.) 344; Wethersfield v. Humphrey, 20 Conn. 218; North American Dredging Co. of Nevada v. Mintzer, 245 F. 297 (C.C.A.9 cir. 1917).
In United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940), the Supreme Court held that a waterway, although not navigable in its ordinary condition, may nevertheless be held to be navigable if it can be made suitable for use as a "highway of commerce" in the future by "reasonable improvements."
Thus the jurisdictional question presented here must include an inquiry, first, into whether the canal in question is capable of being used, in its ordinary condition, for valuable public use as a highway of commerce, and for useful interstate or foreign commerce of a substantial and permanent nature. If it is not capable of that use in its natural condition, then the court must look to the facts to see if the waterway could fit the definition of a highway of commerce, in the event "reasonable improvements" are made. In making the last mentioned inquiry, the court must determine what is "reasonable" in making the waterway capable of serving as a highway of commerce.
To establish admiralty jurisdiction, the party who asserts it must prove that the waterway is navigable in fact and forms a "continuous channel" or highway for commerce among the states or with foreign countries. The Daniel Ball, supra; The Montello, 20 Wall. (U.S.) 430, 22 L.Ed. 391; Leovy v. United States, supra.
In the instant suit the defendants, Gulf Oil Corporation and Berry Brothers, are asserting that the canal in which the damage occurred was a navigable waterway. The burden of proving navigability thus rests on them. They take that position, contending that since the waterway was navigable, it comes under federal jurisdiction, and the Code of Federal Regulations, Title 49, Section 192.727, applies. They argue that plaintiff was negligent in having failed to comply with that regulation.
The majority has found that plaintiff was negligent for reasons other than those *923 set out in the federal regulations, but that maritime law applies and accordingly that defendants are liable for only one-half of the damages sustained by plaintiff. I agree that plaintiff is guilty of contributory negligence, but I do not agree that maritime law applies. I think Louisiana tort law applies, and that plaintiff is barred from recovery by its own contributory negligence. Oddly enough, if plaintiff's view as to navigability is accepted, as I believe it should be, plaintiff's demands will have to be rejected entirely. On the other hand, if defendants' arguments are accepted, defendants will be condemned to pay plaintiff one-half the damages which were sustained. Regardless of the ultimate outcome of the case, the law is clear that the burden of proving navigability rests on the defendants who assert it, and the proper law must be applied when that issue is determined.
The majority has brushed aside the issue of navigability, devoting only three short paragraphs to it. I believe that that issue is of tremendous importance, not only in this case, but because of the disastrous effect the majority opinion will have on many titles to real property if the opinion is allowed to stand.
It is significant to note that the defendants in this suit did not allege in any of their pleadings that the canal on which this accident occurred was navigable, or that maritime law should be applied. On the contrary, in response to plaintiff's petition defendants specifically pleaded contributory negligence on the part of the plaintiff, under Louisiana law, as a bar to recovery by plaintiff. The position they took in their pleadings thus is inconsistent with the position they take on this appeal.
At the trial, plaintiff timely objected to defendants' attempt to prove navigability, on the ground that it would constitute an enlargement of the pleadings. The trial judge allowed the evidence to be introduced subject to the objection, and he ultimately ruled that it was admissible. He stated in his reasons for judgment, however, that he had serious doubts as to whether the canal was a navigable waterway of the United States, as that term is defined in The Daniel Ball case, supra, noting that the canal had been "constructed on private land, with private funds, and would be neither a common nor a public waterway." The trial judge made no decision as to navigability, however, since he concluded that the outcome of the case would be the same whether Louisiana law or maritime law is applied.
In Robichaux v. Theriot, 242 So.2d 644 (La.App. 1 Cir. 1970), a collision between two motorboats occurred on a canal in LaFourche Parish. The defendant did not allege that the canal was navigable, but the question of navigability and the application of admiralty law became an issue at the trial. The court held, in effect, that defendant was precluded from asserting the navigability of the canal because he had failed to allege it in its pleadings. The court said:
"Counsel for the appellant contends that the Forty Arpent Canal is a navigable body of water, and that if the court should find any negligence on the part of Breaux was a concurrent cause of the collision, then, the appellant argues that any judgment rendered should not be a solidary liability, but that the Divided Damages Rule of Admiralty Law should apply. The trial court correctly disposed of this issue by pointing out that the issue was not raised either in the pleadings, or in the trial of the case. In the absence of proof of the navigability of the body of water, the court could not presume that it was navigable. Burns v. Crescent Gun & Rod Club, 116 La. 1038, 41 So. 249. The Trial Court correctly disposed of this issue by holding the evidence did not show the body of water was navigable." (Emphasis added).
In my opinion the rule applied in Robichaux, supra, should be applied here.
*924 Regardless of the pleadings, however, I think the evidence in this case shows that the canal on which the accident occurred clearly was not a navigable waterway of the United States, and that admiralty law is not applicable.
The waterway involved here is a private canal, constructed on private lands, with private funds, for the sole purpose of enabling a privately owned company to explore for oil and gas. It has never been used for navigation of any kind, and it is incapable of being used for any kind of commerce.
Actually, it was a dead-end slip, dug in a swampy area of Iberia Parish before 1965, for the sole purpose of getting a drilling rig into a location where a gas well was to be drilled. The original slip was about 300 or 400 feet long, and after it was completed a drilling rig was located at the end of that slip, the well was drilled, and the pipeline involved in the suit was constructed partially in the middle of the slip. That well was abandoned in 1966, and neither the well nor the pipeline have been used since that time.
In 1965 Phillips Petroleum Company extended the slip or canal further to the south, and it drilled a well at the flead-end of the extended slip. In August, 1972, Gulf Oil Corporation arranged to dredge out the original and a part of the extended canal so that it also could get a drilling rig to a location near the Phillips Petroleum Company well. This accident occurred while the original slip or canal was being cleaned out and restored to its original depth. The evidence indicates that the total length of the dead-end slip or canal after all of these extensions had been made was about 2,000 feet.
The canal was about 70 feet wide. That is the minimum width that canals used to reach drilling locations could be made, since the dredge boats used in digging them are approximately 50 feet wide. The evidence shows, without contradiction, that the canal involved here was never used for navigation of any kind. The only vessels which have ever used is, according to the record, were (1) a dredge in 1965 when the original slip was extended to reach the Phillips location, (2) the dredge operated by Berry Brothers in 1972 when this accident occurred, and (3) a floating "camp house," which was allowed to tie up in the canal for a period of time. The record is devoid of any other use of or activity on this canal. The evidence does not even show that the canal was used to transport drilling crews to and from the rigs while drilling operations were conducted. When defendants, themselves, checked this canal prior to beginning the last dredging operation, they used aircraft instead of water craft to get to and from it.
The north end of this dead-end canal joins or connects with a stream known as Bayou Pigeon, a winding stream which flows into "Plaquemine Route Waterways," the latter being described as being a part of the Atchafalaya Basin. Those waterways flow into the Atchafalaya River, and that river in turn flows into the Gulf. The evidence shows that Bayou Pigeon was navigable, in fact, in that boats and barges could use it, but there is no showing as to whether even that bayou could be classified as a highway of commerce.
In my opinion the private canal involved here is not a waterway which the general public can utilize as a highway of commerce. A "highway of commerce" denotes an instrumentality over or on which the general public may freely traverse and carry out useful commercial purposes. A dead-end canal, only 2,000 feet in length, may be useful for some commercial purpose for the private owners but it cannot be said to offer the general public a viable vehicle on which to conduct trade or travel.
A private canal, built on private land with private funds for purposes of navigation does not become public in the sense *925 that the public is entitled to the use of the private canal and the use of its banks. Harvey v. Potter, 19 La.Ann. 264 (1867) and National Audubon Society v. White, 302 So.2d 660 (La.App. 3 Cir. 1974). The dead-end canal involved here was built on private land, with private funds, for the purpose of floating a drilling rig to a drilling site. The evidence does not show that it has ever dedicated to public use or that the owners of the land ever intended to dedicate the canal for such use. It would follow, therefore, that the owners of this private canal have the absolute right to control its use, including the right to prohibit the general public from using it entirely, or even to dam it up. Under those circumstances, I think it is illogical to hold that this dead-end private canal is a public highway of commerce, capable of sustaining admiralty jurisdiction.
The majority relies on National Audubon Society v. White, 302 So.2d 660 (La. App. 3 Cir. 1974), and Dow Chemical Company v. Dixie Carriers, Inc., 463 F.2d 120 (5 Cir. 1972), in holding that the private ownership of the waterway is irrelevant to the question of whether admiralty jurisdiction applies. I think both of those cases compel the conclusion that maritime jurisdiction does not apply here.
In National Audubon, supra, no question of maritime jurisdiction was presented, but the opinion makes it clear that the canal involved there was privately owned and controlled, and was not a public highway of commerce. In Dow, supra, only one paragraph was devoted to the question of the applicability of maritime law, and very few facts were given with reference to the canal. By referring to the opinion handed down by the U.S. District Court in that case, however, in 330 F.Supp. 1304 (S.D. Tex., 1971), it appears that the Dow canal was more than five miles long, it connected with the Intercoastal Waterway, and was used extensively by barges, tug boats and other commercial vessels in interstate commerce. At least two large industries used it constantly. That report made it clear that it had been dedicated for public use.
In Mintzer v. North American Dredging Co., 242 F. 553 (D.C.Cal.1916), the court said:
"Nor does the evidence show that the channel is or will be in any true sense useful to the public for the purpose of navigation. It is true it is now within the corporate limits of the city of Richmond, which in that sense may be said to constitute a public terminus. But, as the evidence shows, it lies only at its `back door,' so to speak, runs wholly through private property, and is so situated that its use is, and so far as appears can be, available only to the Oil Company and the Belt Railroad, should the latter see fit to construct an approach. It is not accessible or available to the public, nor to any other private industry: the evidence showing that the nearest established street of the town is at least a quarter of a mile from its southern terminus. Under the principles above stated, I am satisfied that the court would not be justified upon the facts in holding this channel to be a navigable stream."
I agree with the following language which was used in Malony v. City of Milwaukee, 1 F. 611 (D.C.N.Y. 1880):
"Without going at large into a discussion of the reasons for and against the jurisdiction, it is enough for the disposition of the point in this case to say that, upon a careful perusal of the opinions delivered by the supreme court which touch upon the question, it seems to me that the test established for determining the jurisdiction in admiralty, in a case of alleged maritime tort not on tide-water, is whether the place in which it was committed is upon the `navigable waters of the United States,' and that an artificial water-way or canal opened by a state to public use, for purposes of commerce, and while in fact used as a highway *926 of commerce between the states of the Union, and between foreign countries and the United States, is `navigable water of the United States' within the meaning of that term as used to define and limit the jurisdiction of the admiralty courts."
See also Manigault v. S. M. Ward & Co., 123 F. 707 (C.C.S.C.1903).
Applying the above well settled rules to the facts in the instant suit compels the conclusion, I think, that the privately owned, dead-end slip or canal involved here is not and cannot conceivably be a navigable waterway of the United States, in the sense that admiralty or maritime law can be applied.
I would hold that Louisiana tort law applies in this case, and that plaintiff is barred from recovery by its own contributory negligence. In my view the judgment of the trial court should be reversed, and judgment should be rendered rejecting plaintiff's demands, at its costs.
For these reasons, I respectfully dissent.