**HIGMAN TOWING COMPANY, Owner of BARGE S–2021,**

v.

**The DREDGE TOM JAMES, Her Engines, Tackle, Apparel, etc., In Rem, and T.L. James & Company, Inc., In Personam.**

Civ. A. No. B–83–1125.

United States District Court,
E.D. Texas,
Beaumont Division.

June 18, 1986.

Louis H. Beard, Wells, Peyton, Beard, Greenberg, Hunt & Crawford, Beaumont, Tex., for plaintiff.

Randolph J. Waits, New Orleans, La., O.J. Weber, Mehaffy, Weber, Keith & Gonsoulin, Beaumont, Tex., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

COBB, District Judge.

Came on this day the above styled cause, and the court having considered the evidence presented and arguments of counsel, enters the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. At all times material hereto, plaintiff Higman Towing Company was the owner and operator of the pushboat M/V JOHNNY BROWN and the steel tank barges S–2021 and S–2022. Defendant T.L. James & Co., Inc. was the owner and operator of the dredge TOM JAMES.

2. In March 1983, T.L. James & Co. entered into a contract for dredging in the Houston Ship Channel with the United States Army Corps of Engineers. The contract authorized defendant to install submerged pipelines for the disposal of dredged material without the necessity of

obtaining a formal permit from the Corps of Engineers. The contract imposed no obligations to mark submerged pipelines except where the pipelines crossed navigable channels. At all times material hereto, the pipeline was positioned in the channel in accordance with the terms of the contract, and was marked by buoys at all navigable channel crossings.

3. On July 29, 1983, the United States Army Corps of Engineers, Galveston District, issued Notice to Navigation Interests 83–19 advising that the dredge TOM JAMES would be working from Mile 37 to Mile 40 upstream in the Houston Ship Channel. The Notice further indicated that "pipe lines going to Lost Lake Disposal Area will be on the north side of the Channel" during the month of August. On September 2, 1983, a second notice was issued advising of the presence of the discharge line along the north side of the channel and stating that the dredge would be working between Miles 37 and 42 during the month of September.

4. On September 10, 1983, the day of the collision, the TOM JAMES was dredging portions of the Houston Ship Channel in accordance with the terms of the contract. The dredge was situated in the ship channel above the Shell Oil Terminal. The 30" diameter spoil discharge pipeline from the dredge extended eastward and downstream along the right ascending bank of the channel. At 0915 hours of that day, approximately 20,000 to 30,000 linear feet of the spoil discharge pipeline was connected to the dredge. Of that total footage, approximately 4,000 feet of the pipeline nearest the dredge was floating, with the remainder of the pipeline being submerged.

5. The M/V JOHNNY BROWN and tow, consisting of the S–2021 as lead barge and the S–2022 as the barge between the S–2021 and the bow of the pushboat, was transiting upstream the Houston Ship Channel en route to the Shell Oil Company Terminal. The S–2021 and S–2022 were loaded with crude petroleum, and each barge was drawing approximately 9'6" of water.

6. Upon entering the ship channel at the Lynchburg Ferry Landing, Captain Charles Retherford of the M/V JOHNNY BROWN contacted the United States Coast Guard's Vessel Traffic System for the Houston Ship Channel. Captain Retherford informed the VTS of the location, course, speed and destination of the vessel and tow, which information was received and approved by the VTS. Captain Retherford received a report of traffic in the ship channel from the VTS, said report containing no mention of dredges or spoil lines in the area where the M/V JOHNNY BROWN and tow would be traveling.

7. In order to enter the Shell Oil Terminal Slip where the barges were to be moored and have their cargos discharged, Captain Retherford elected to "double up" the barges so that the barges would be side by side rather than single file. In order to complete the doubling up process and get out of vessel traffic in the Channel, Captain Retherford navigated the vessel and tow outside the dredged portion of the Channel to a point 150 to 200 feet from the right ascending bank across from the Shell Oil Terminal area. At this location, the depth of the water is 9 to 11 feet deep. On prior occasions, Captain Retherford had successfully completed the doubling up process in the same area of the Channel without incident.

8. During the doubling up process, while approximately 150' outside the Channel and some 150' from the right ascending bank, in water about ten to eleven feet deep, the lead barge and subsequently the trailing barge ran aground on the submerged discharge line of the TOM JAMES. Captain Retherford proceeded with the doubling up, but then noticed oil in the ship channel. Upon determining that oil was coming from the No. 1 tank on S–2021, Captain Retherford pushed his barges to the bank and pumped water into the No. 1 tank stopping the flow of oil into the waterway. Due to a bend in the ship channel, the M/V JOHNNY BROWN and the TOM JAMES were not in sight of one another at

any time preceding the grounding of the barges.

9. The crew of the TOM JAMES became aware of the incident when the deck captain Octave Pontiff and operator Roy Richard noticed a sudden drop in the discharge line pressure. Captain Pontiff boarded a dredge tender and conducted a visual inspection of the line. Captain Pontiff located the damaged section of line. Captain Pontiff ordered his crew to repair the damaged line. A 3000' section of new line was installed. The dredge was shut down for approximately 12 hours.

10. On September 10, 1983, inspectors from the United States Coast Guard permitted Captain Retherford to move his tow to the Shell Oil Terminal dock, where the cargo was discharged. The M/V JOHNNY BROWN and the barges proceeded to Higman Towing Company docks in Orange, Texas. A 15" gash was found in the hull of the S–2021. The M/V JOHNNY BROWN then towed the S–2022 on another voyage to Southwest Pass, Louisiana. On arrival, Captain Retherford found water in the No. 1 tank of the S–2022. Upon repair, a 10" gash was found in the hull of the barge. On the voyages from the Shell Oil Terminal to Southwest Pass, the S–2021 and S–2022 did not go aground and were not involved in any other accidents.

11. The damage to the barges was caused by the collision with the submerged discharge line from the Dredge TOM JAMES.

12. There were no buoys, signs, lights or other navigational aids or markings which marked the location of the submerged pipeline from the TOM JAMES, except where the pipeline crossed navigable channels. There were no signs on the shore of the Houston Ship Channel of any type which called attention to the presence of the submerged pipeline. The pipeline was not suitably or adequately marked to warn of an obstruction to navigation. The Notice to Mariners describing the presence of the dredge and pipeline was not a sufficient warning to relieve T.L. James & Co. of its duty to mark the submerged pipeline.

13. On September 10, 1983, neither the M/V JOHNNY BROWN nor her tow were equipped with a fathometer or other depth finding device.

14. Neither Higman Towing nor Captain Retherford had taken any steps to obtain Notice to Mariners indicating the location of the dredge TOM JAMES and warning of the presence of the submerged pipeline. Had Captain Retherford known of the Notice to Mariners, he would have used another area in which to double up his barges.

15. Captain Retherford and his crew were not adequately monitering Channel 13 of the VHF radio while proceeding up the ships channel. Had Channel 13 of the VHF radio been monitered, then the M/V JOHNNY BROWN would have probably received warning of the presence of the dredge and pipeline and there might well have been no collision.

16. The collision occurred outside the dredged portion of the ship channel but was within the navigable reaches of the ship channel. The submerged discharge line constituted an obstruction and hazard to navigation in the Houston Ship Channel. Because of the amount of barge traffic in this area of the ship channel, it was reasonably foreseeable that tows such as the JOHNNY BROWN and tow would be navigated in that portion of the Channel where the submerged line was located. Many barges the size of S–2021 and S–2022 have a draft of as much as 9'6".

17. Had the submerged discharge line from the TOM JAMES, positioned as it was at the time in question, been adequately marked with buoys, warning signs or flashing lights, then the M/V JOHNNY BROWN tow would not have collided with the submerged discharge line but would have navigated clear of the line.

18. The failure of the defendant to adequately mark the submerged discharge line from the TOM JAMES, either with buoys, warning signs or lights, constituted negligence and such negligence was a proximate

cause of the collision on September 10, 1983, and of the resulting damages to the S–2021 and S–2022.

■ 19. The failure of the plaintiff's employees and agents to obtain and read the July 29 and September 2, 1983, Notices to Navigators which warned of the presence of the TOM JAMES and the submerged discharge line, and the failure to adequately monitor VHF Channel 13 constituted contributory negligence and such contributory negligence was a proximate cause of the collision on September 10, 1983, and the resulting damages to the S–2021 and S–2022.

20. The negligence of the defendant contributed to the damages to the plaintiff in the amount of 25%. The contributory negligence of the plaintiff contributed to his own damages in the amount of 75%.

21. Insofar as any Conclusion of Law, *infra*, may be construed as Findings of Fact, it is hereby adopted as such.

## CONCLUSIONS OF LAW

1. The court has jurisdiction over the subject matter of this action and venue is proper in this district. The defendant has fully answered in this cause and has submitted itself to the jurisdiction of this court.

2. The Inland Navigational Rules, 33 U.S.C.A. 2001 *et seq.*, were in full force and effect at the time of the incident. Further, 33 C.F.R. § 64.01-1 requires that the owner of a sunken obstruction which creates an obstruction to the navigable capacity of U.S. waters may be liable for resulting damages to the public. It further requires that the owner of such an obstruction suitably mark the obstruction.

■ 3. Leaving the dredged channel does not necessarily place a vessel at its own peril. A vessel in navigable waters is entitled to use the full reach of the navigable waters free of underwater hazards, and is not limited to the dredged or regular waterway. *Humble Oil & Refining Company v. The Tug CROCKET*, 422 F.2d 602 (5th Cir.1970); *Plantation Pipeline Co. v.*

*Findlay Towing Co., Inc.*, 177 A.M.C. 2553 (S.D.Ala.1977).

■ 4. Governmental approval for the installation and placement of an underwater pipeline does not remove from the owner of the pipeline the obligation to suitably mark it when it is an obstacle to navigation. The fact that a contract with a governmental agency requires that the pipeline be marked in some areas does not excuse the non-marking of other areas when such markings are required by custom, law, or safe navigational practice. Authorization by regulatory authorities to place an obstruction in navigable waters does not preempt the duty to mark such obstacles. *Plantation Pipeline Co. v. Findlay Towing Co., Inc., supra; Southern National Gas Company v. Gulf Oil Corporation*, 1976 A.M.C. 616 (3rd Cir.Ct. of Appeals, La., 1975).

5. 33 C.F.R. 164.33 requires that vessels carry the most recent available Notice to Mariners for the areas that a vessel will transit. General Maritime Law and safe navigation require the most up-to-the-date charts and local information. *Hurst v. City of Virginia Beach*, 1972 A.M.C. 2346 (E.D.Va.1972); *Placid Oil Company v. S.S. Willowpool*, 214 F.Supp. 449 (E.D.Tex. 1963).

6. Section 5 of the Vessel Bridge-to-Bridge Radiotelephone Act, 33 U.S.C. §§ 1201–1208, as well as safe navigation, requires that a listening watch must be maintained on the designated frequency. (Channel 13 on the Houston Ship Channel).

7. This court has previously bifurcated the liability and damage issues. The court makes no determination as to the amount of damages and limits its Findings to liability issues only.

8. Insofar as any Findings of Fact, *supra*, may be construed as a Conclusion of Law, it is hereby adopted as such.